# IN THE COURT OF APPEALS OF IOWA

No. 20-0301
Filed June 16, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CHRISTOPHER HUTCHCROFT,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Delaware County, Monica L. Zrinyi Wittig, Judge.

Christopher Hutchcroft appeals the restitution order imposed by the district court following his guilty pleas to first-degree theft, first-degree criminal mischief, and third-degree burglary. **REVERSED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Ahlers, JJ.

**VAITHESWARAN, Presiding Judge.**

Christopher Hutchcroft entered a largely vacant foreclosed building without permission and took items exceeding $10,000 in value. He also damaged the building by breaking pipes and fuse boxes, with the damage exceeding $10,000. The State filed several charges. Hutchcroft pled guilty to first-degree theft, first-degree criminal mischief, and third-degree burglary. The court later imposed judgment and sentence, including an obligation to pay victim restitution.

The State filed a statement of pecuniary damages asserting the victim lost $1,775,000. Following an evidentiary hearing, the district court concluded Hutchcroft's actions were "the direct cause of the damages to the electrical system inside the building." After requiring the State to present additional evidence to support its requested amount of restitution, the court imposed a victim restitution obligation of $707,000. Hutchcroft appealed.[1]

---

[1] The State asserts Hutchcroft had to seek review by application for writ of certiorari and "[t]he grant of certiorari is unnecessary." The State also sees "no good cause" for considering a direct appeal from a guilty plea pursuant to Iowa Code section 814.6 (2020). We are persuaded Hutchcroft had a right to file a direct appeal. *See* Iowa Code §§ 910.2(1)(a)(1) ("In all criminal cases in which there is a plea of guilty, . . . the sentencing court shall order that pecuniary damages be paid by each offender to the victims of the offender's criminal activities . . . without regard to an offender's reasonable ability to make payments."); 2020 Iowa Acts ch. 1074, § 74 (to be codified at Iowa Code § 910.3(8) (2021) ("A permanent restitution order *entered at the time of sentencing* is part of the final judgment of sentence as defined in section 814.6 and *shall be considered in a properly perfected appeal*." (emphasis added)); *State v. Damme*, 944 N.W.2d 98, 105 (Iowa 2020) (holding "good cause exists to appeal from a conviction following a guilty plea when the defendant challenges his or her sentence rather than the guilty plea"); *State v. Jauregui*, No. 20-0629, 2021 WL 1663598, at *1 n.1 (Iowa Ct. App. Apr. 28, 2021) ("The State agrees [the defendant] has good cause to appeal because he is challenging a component of his sentence as opposed to his guilty plea.").

Hutchcroft contends "the record lacked substantial evidence supporting a finding of $707,000 in pecuniary damages and the State failed to establish the causal connection of that amount to [his] criminal offenses." Hutchcroft correctly notes that our review of the district court's fact findings is for substantial evidence. *See State v. Roache*, 920 N.W.2d 93, 99 (Iowa 2018); *see also State v. Waigand*, 953 N.W.2d 689, 695 (Iowa 2021) (stating sentencing courts "should not rubber-stamp victim restitution claims" (quoting *Roache*, 920 N.W.2d at 108)). He is also correct that "[t]he defendant's criminal conduct must have been the cause in fact of the loss and within the scope of liability." *Waigand*, 953 N.W.2d at 694; *Roache*, 920 N.W.2d at 100.

The district court made the following pertinent findings. The court observed the building "was being vandalized on a regular basis"; "[i]tems such as fuses, hose clamp couplers, copper, breakers and other electrical components for the building's electrical system were being removed"; and "[t]he damage was not only in the interior of [the] building as there was apparent tampering to the exterior transfer box also." A camera was placed on the building "due to the number of reported break-ins." Officers verified Hutchcroft was in the building "for over 4 hours on at least one occasion." Hutchcroft testified he was inside the building "maybe 3–4 times." "He admitted to taking footings from the basement, wiring from some of the electrical boxes, stainless steel fittings, copper and to dismantling a breaker box." "The items he stole he sold and garnered approximately $6,000.00–$7,000.00 dollars." The court further found:

> When the police entered the building to video the interior, they found that every electrical box in the building had been destroyed, with wiring hanging out of the piping and fuses removed. The electrical

piping had been sawed to gain access to the wiring inside, which had been removed by the use of a winch. A review of [Hutchcroft's] cell phone revealed he had been in and out of the building, at the very least, between the months of May through October of 2017.

The court determined Hutchcroft "owe[d] for damages to the electrical boxes and any damage to the areas of where he entered and exited the building," as well as "the value of the fuses, the piping he cut to take out the wiring, the cost of the wiring, the cost of copper he removed, and cost of the stainless steel fittings." The court stated the owner could "be compensated for the length of copper that need[ed] to be purchased for replacement, not any more than that," and he might "be entitled to the cost for an electrical box, but not a new one." The court found the owner was "not entitled to a complete overhaul of the electrical system and he [could] not be put in a better position than he was in prior to the illegal conduct." For example, the court noted there were "repair estimates for an HVAC system . . . but there [was] no evidence to support [Hutchcroft] caused any damage to the HVAC system." The court ordered the State to provide "more detailed information" that was "specific to the losses of" the owner so it could "separate out repairs that [could] not be connected to" Hutchcroft.

In response, the State provided a letter from an electric repair company stating in part, "[O]ur quote contained equipment I felt should be replaced with new gear. The condition of the equipment in my opinion was too dangerous to be put in operation and thus reflected in my quote to [the owner]." The district court determined the letter failed to comply with its directive and ordered the State to provide additional information. The State presented a second letter stating:

This letter is to establish an estimated cost for replacement of equipment, wiring and damages done to the industrial building used to process feed ingredients owned by Mr. Randy Less at 204 Locust Street, Hopkinton, IA. This estimation encompasses the motor control centers, including switch boxes, fused disconnects, electronic gear, and conductors stripped from the facility. Controls will have to be rewired and reprogrammed to make them operational, and within the NEC (National Electrical Code). The value of the equipment that was previously implemented in an operational state is listed below, with the cost of replacing the lost and damaged items itemized in the following quotation, attached. A depreciation factor of .7 (70% of value) is being used to represent the original installed value, prior to vandalizing the building.

|  | Total Cost Installed | Depreciated Value (70%) |
| --- | --- | --- |
| 1. Project #1 Cooling Towers Control 2Center: | $475,000.00 | $332,500.00 |
| 2. Project #2, Main Room Control Center: | $225,000.00 | $157,500.00 |
| 3. Project #3, Boiler Room Switch Gear: | $85,000.00 | $59,500.00 |
| 4. Project #4, Boiler Room Control Center: | $210,000.00 | $147,000.00 |
| 5. Project #5, Repair Termination Blocks on Transformer: | $15,000.00 | $10,500.00 |
| Total cost to replace/install equipment and wiring to make operational: | $1,010,000.00 | $707,000.00 |

The building was previously operated as an ethanol refinery. The motor control centers were extensive that were rendered useless with most of the wiring ripped out or destroyed. Every electrical box was destroyed and the fuses we taken out, with conduit hanging out and or demolished. In order for the building to be fully operational and completed to a safe commercial use. Because of the nature of complexity and danger presented by the required amperage and voltage of the commercial operation After Market and substandard parts are not an option given the NEC safety standards of this industry and rigorous safety testing of equipment involved.

The court accepted the $707,000 figure contained in the second letter.

The State notes that the district court did not "rubber stamp" the State's proposed restitution figure" and "rejected the notion that the victim was entitled to have everything broken repaired with new equipment." In the State's view, the

court only deemed the State's restitution figure appropriate "after the electrician factored in the depreciated value." We agree the depreciated value set forth in the exhibit accounts for the age of the items in the building. But the State still had to prove Hutchcroft caused all the damage listed in the exhibit.

The owner testified at the restitution hearing and acknowledged that, as early as 2016, vandals "were just starting" to damage the building by "cutting it apart." He "called the sheriff's [office] a lot." He believed "[t]here was damage ongoing to the electrical system in 2017." In describing the damage, he repeatedly referred to multiple perpetrators.

Hutchcroft denied causing all the damage flagged by the owner. For example, the owner identified a breaker box that, in his words had "been gutted." When Hutchcroft was shown a picture of the breaker box, he stated, "That was empty, just—that was empty and rummaged through. I think this is like a room that was downstairs. That was completely destroyed when I [first] ever seen it." Similarly, the owner identified a transformer and said "[t]hey cut all of the stuff out of it, and they just didn't get finished, copper lining, took all of the brains out of it per se." Hutchcroft responded, "I seen that laying on the ground, like one or two times that I was in there. . . . It looked exactly like that when I seen it. . . . I don't believe [I ever touched it]." Hutchcroft also denied removing parts of a motor control center identified by the owner "where they went in and started cutting the wire out of it and disassembling all of the guts outside of it." Examining a picture of the item, Hutchcroft stated, "It looked just like that when I seen it. . . . All of these, all of these control centers and all of that were already rummaged through

and destroyed." Neither the owner nor the State refuted Hutchcroft's testimony that he had nothing to do with damage to these items.

The record lacks substantial evidence to support a finding that Hutchcroft caused all the damage listed in the electric repair company's exhibit. Accordingly, we reverse the restitution award. *See Waigand*, 953 N.W.2d at 694; *State v. Ihde*, 532 N.W.2d 827, 830 (Iowa Ct. App. 1995) (stating "[t]here is no evidence defendant was charged for a longer period or admitted involvement for the longer period" and "[t]heft by another individual, in which the defendant did not participate, is not chargeable to him"); *State v. Appell*, No. 05-0498, 2005 WL 3116098, at *2 (Iowa Ct. App. Nov. 23, 2005) (concluding the record lacked a factual basis to support a finding the defendant received certain stolen goods, requiring reversal of the restitution order). We remand for a determination of the amount of damage caused by Hutchcroft.

**REVERSED AND REMANDED.**